## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

PATRICK AYERS, derivatively on behalf of ZYNEX, INC.,

          Plaintiff,

v.

THOMAS SANDGAARD,
DANIEL MOORHEAD,
JOSHUA R. DISBROW,
MICHAEL D. CRESS,
BARRY D. MICHAELS,

          Defendants,

and

ZYNEX, INC., a Nevada Corporation,

          Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND**

---

### INTRODUCTION

Plaintiff Patrick Ayers ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Zynex, Inc. ("Zynex" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Thomas Sandgaard ("Sandgaard"), Daniel Moorhead ("Moorhead"), Joshua R. Disbrow ("Disbrow"), Michael D. Cress ("Cress"), and Barry D. Michaels ("Michaels") (together, the "Individual Defendants," and collectively with Zynex, "Defendants") for breaches of fiduciary duties, waste of corporate assets, unjust enrichment, gross mismanagement, and/or the aiding and abetting thereof, as well as violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following on

information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities & Exchange Commission ("SEC"), a review of news reports, press releases, and other publicly available sources, and pleadings filed in the related securities class action, captioned *Tuncel v. Zynex, Inc. et al.,* No. 1:25-cv-00913-SKC (D. Colo.), filed in this Court on March 20, 2025 (the "Securities Class Action").

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Zynex's officers and directors from at least March 13, 2023, to the present (the "Relevant Period").

2.      Prior to the Relevant Period, Zynex positioned itself as a leader in the medical device industry, touting consistent revenue growth and operational success. In 2022, the Company reported a 21% year-over-year revenue increase to $158.2 million, a 48% increase in orders, and seven consecutive years of profitability. These results, announced in a March 13, 2023 press release, set the stage for optimistic projections about Zynex's growth trajectory.

3.      Unbeknownst to analysts and investors, however, at the same time, the Individual Defendants began artificially inflating Zynex's stock price by issuing or allowing false and misleading statements about the Company's financial performance, operational practices, and compliance with insurance reimbursement policies. These statements concealed a systemic "oversupplying scheme" whereby Zynex shipped excessive quantities of supplies, such as electrode pads and batteries, to patients, billing insurers for thousands of dollars more than necessary. Zynex's undisclosed practices drew scrutiny from insurers, including Tricare (the

federal health insurer for the military), which represented 20–25% of its annual revenue.

4.    The truth began to emerge on June 4, 2024, when the medical journal *STAT* published an investigative report titled "How a device maker inundated pain patients with unwanted batteries and surprise bills." The report revealed Zynex's oversupplying scheme, stating:

> [Zynex], with headquarters in Englewood, Colo., has manufactured small machines that deliver different series of electrical pulses to the injured areas via wires and electrode pads.

*    *    *

> . . . the regular shipments also allow Zynex to bill insurers for thousands of dollars more than it otherwise could.

*    *    *

> The problem is that insurers are growing wise to the program and kicking the company out of network.

5.    The *STAT* report detailed patient complaints, such as Michelle Bean, who received unneeded supplies and faced $1,000 in bills after Zynex falsely assured coverage by Tufts Health Plan. Former employees confirmed the scheme's systemic nature, costing Zynex business as insurers terminated network agreements.

6.    On June 4, 2024, Zynex's stock price fell $0.50 per share, or 5%, closing at $9.35 on unusually heavy trading volume, reflecting investor alarm over the exposed misconduct. This decline eroded shareholder value and signaled market distrust in Zynex's reported financials.

7.    Despite this disclosure, Defendants continued to make or allow misleading statements. For example, on July 25, 2024, Zynex's second-quarter 2024 press release claimed an 11% revenue increase to $49.9 million and a 20% order increase, with Sandgaard asserting, "[t]he second quarter of 2024 was highlighted by a strong cadence of order growth and revenue[.]" The release attributed lower-than-expected revenue to sales force reductions, omitting insurer scrutiny as a factor.

8.    The full extent of Zynex's misconduct was finally revealed on March 11, 2025, when the Company issued a press release announcing fourth-quarter and full-year 2024 results. The release disclosed a significant revenue "shortfall" due to "slower than normal payments from certain payers" and revealed, "Tricare has temporarily suspended payments as they review prior claims." The March 11, 2025, press release admitted that Tricare, representing 20% to 25% of Zynex's annual revenue, was scrutinizing prior claims, threatening the Company's financial stability.

9.    The next day, on March 12, 2025, Zynex's stock price plummeted $3.59 per share, or 51.3%, closing at $3.41 per share. This catastrophic decline wiped out significant shareholder value, reflecting the market's reaction to Zynex's exposure to regulatory and financial risks concealed by the Individual Defendants.

10.    The Individual Defendants' misconduct has caused substantial harm to Zynex, including costs associated with the Securities Class Action, overpayment for repurchases of Company securities at inflated prices, reputational and economic damage from insurer terminations, and a "liar's discount" affecting the Company's stock price and ability to raise capital on favorable terms. This action seeks to remedy these wrongs and hold the Individual Defendants accountable to Zynex.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1).

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

13.    This derivative action is not a collusive action to confer jurisdiction on federal court that would not otherwise have such jurisdiction.

14.    Plaintiff brings this action solely to redress injuries to Zynex caused by the Individual Defendants' misconduct, ensuring the Court's jurisdiction is properly invoked.

15.    Venue is proper in the District of Colorado because the Individual Defendants have been involved in business in the District. Zynex's principal executive offices are located in Englewood, Colorado, and the Defendant's false statements, disseminated from this District, caused significant harm to shareholders here and elsewhere.

## THE PARTIES

### Plaintiff

16.    Plaintiff is a current shareholder of Zynex and has continuously held Company common stock since January 10, 2023.

### Nominal Defendant Zynex

17.    Zynex is a Nevada corporation with its principal executive offices at 9655 Maroon Circle, Englewood, Colorado 80112. Zynex's common stock trades on the NASDAQ stock exchange under the ticker symbol "ZYXI."

### Defendant Sandgaard

18.    Defendant Sandgaard is the founder of Zynex and has served as President, Chief Executive Officer ("CEO"), and Chairman of the Board since the Company's inception in 1996. Sandgaard received total compensation of approximately $991,810 in 2024, including a $700,000 salary, $112,458 in stock awards, $170,625 in Non-Equity Incentive Plan Compensation, and $8,727 in All Other Compensation. As of March 19, 2024, he held 16,049,666 shares of common

stock (more than 50% of outstanding shares), valued at over $207 million based on Zynex's then-closing stock price of $12.93 per share. On May 10, 2023, Sandgaard sold 300,000 shares of his own Zynex common stock back to the Company at the artificially inflated price of $9.61 per share realizing proceeds of more than $2.88 million. On June 13, 2023, Sandgaard sold another 300,000 shares of his Zynex common stock back to the Company at the artificially inflated price of $8.62 per share realizing proceeds of more than $2.58 million. In each instance, the transaction was approved by the Board's Audit Committee and the purportedly disinterested members of the Board, in violation of their fiduciary duties. Sandgaard is named as a defendant in the Securities Class Action.

### Defendant Moorhead

19.    Defendant Moorhead has served as Zynex's Chief Financial Officer ("CFO") since June 2017, responsible for financial reporting and compliance with SEC regulations. In 2024, Moorhead received total compensation of approximately $909,805, comprising a $415,000 salary, $304,158 in stock awards, $125,000 in bonuses, $33,719 in Non-Equity Incentive Plan Compensation, and 31,928 in All Other Compensation. As of March 19, 2024, he held 356,930 shares of Zynex common stock, valued at over $4.6 million. Moorhead is named as a defendant in the Securities Class Action.

### Defendant Disbrow

20.    Defendant Disbrow has served as a Company director since 2018. He also serves on the Audit, Compensation, and Nominating and Corporate Governance Committees (Chair).  In 2024, Disbrow received $60,000 in cash compensation and $110,000 in stock awards, totaling $170,000. As of March 19, 2024, he held 62,413 shares of Zynex common stock, valued at $807,000.

**Defendant Cress**

21.    Defendant Cress has served as a Company director since 2018. He also chairs the Compensation Committee and serves on the Audit and Nominating and Corporate Governance Committees. In 2024, Cress received $60,000 in cash compensation and $110,000 in stock awards, totaling $170,000. As of March 19, 2024, he held 62,413 shares of Zynex common stock, valued at $807,000.

**Defendant Michaels**

22.    Defendant Michaels has served as a director since 2018. He chairs the Audit Committee and serves on the Compensation Committee and the Nominating and Corporate Governance Committee. In 2024, Michaels received $65,000 in cash and $110,000 in stock awards, totaling $175,000. As of March 19, 2024, he held 62,413 shares of Zynex common stock, valued at $807,000.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as officers, directors, and/or fiduciaries of Zynex and because of their ability to control the business and corporate affairs of Zynex, the Individual Defendants owed Zynex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zynex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zynex and its shareholders so as to benefit all shareholders equally.

24.    Each director and officer of the Company owes to Zynex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zynex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

26.     To discharge their duties, the officers and directors of Zynex were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

27.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zynex, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, that their conduct posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

28.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zynex were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with applicable laws and regulations, and pursuant to Zynex's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zynex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zynex and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zynex's operations would comply with all applicable laws and Zynex's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

30.    Each of the Individual Defendants further owed to Zynex and the shareholders the duty of loyalty requiring that each favor Zynex's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

31.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Zynex and were at all times acting within the course and scope of such agency.

32.    Because of their advisory, executive, managerial, directorial, and controlling positions with Zynex, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

33.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by Zynex.

34.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, and due care by orchestrating a scheme to inflate Zynex's stock price through false and misleading statements about the Company's financial performance and compliance with insurer reimbursement policies. The Defendants concealed an "oversupplying scheme" that involved shipping excessive electrode pads and batteries to patients, inflating claims to insurers like Tricare, and risking network terminations.

35.     Sandgaard and Moorhead, as CEO and CFO, directly controlled false statements, such as the April 27, 2023, press release claiming a 36% revenue increase to $42.2 million, which omitted that revenue was driven by fraudulent billing practices. These misrepresentations violated Zynex's Code of Business Conduct and Ethics (the "Code"), adopted on February 28, 2023, which mandates: "All of the Company's books, records, accounts, billings and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements[.]"

36.     Disbrow, Cress, and Michaels, as members of the Audit Committee, breached their duty of due care by failing to oversee financial reporting and internal controls, allowing the oversupplying scheme to persist. Their negligence permitted false statements in their annual report for the fiscal year ended December 31, 2023 on a Form 10-K filed on March 12, 2024 with the SEC ("2023 Form 10-K"), which misleadingly claimed, among other things, "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment[,]" while concealing insurer scrutiny.

37.     The Defendants' failure to correct these and other misstatements, despite knowledge of prior lawsuits (*e.g.*, a 2014 claim alleging fraudulent Medicare billing) and other red

flags, demonstrated a reckless disregard for Zynex's compliance obligations. This breached their duty to ensure operations complied with federal and state laws, exposing Zynex to penalties, reputational harm, and other economic damage.

38.     Defendants' insider trading further violated their duty of loyalty. Sandgaard sold 624,000 shares for more than $5.67 million, and Moorhead sold 85,000 shares for $687,200 at artificially inflated prices during the Securities Class Action class period, exploiting nonpublic information about the oversupplying scheme and other misconduct. These sales harmed Zynex by, among other things, undermining investor trust and exacerbating stock price declines post-disclosure.

39.     The breaches caused Zynex substantial harm, including a 51.3% stock price drop on March 12, 2025, litigation costs from the Securities Class Action, and a "liar's discount" depressing future stock value. The Defendants' actions wasted corporate assets, as Zynex repurchased tens of millions of dollars in stock at inflated prices, directly resulting from their misconduct.

40.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Zynex, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

41.     The Individual Defendants breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Zynex substantial damage.

42.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Zynex, were able to and did, directly or indirectly, exercise control over

the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Zynex has expended and will continue to expend significant sums of money.

43.    The Individual Defendants' breaches include permitting false statements, such as the April 27, 2023, claim of a 36% revenue increase, which concealed the oversupplying scheme, inflating claims to insurers like Tricare. This misconduct led to a 51.3% stock price drop on March 12, 2025, litigation costs, and reputational harm, violating their fiduciary duties.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning Zynex's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

46.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal

material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

48.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zynex and was at all times acting within the course and scope of such agency.

## CORPORATE GOVERNANCE

### Zynex's Code of Conduct

49.    The Individual Defendants breached their fiduciary duties to Zynex by violating the Company's Code. These violations, tied to the fraudulent oversupplying scheme and false statements alleged in the Securities Class Action, involved misrepresentations, corporate fraud, unethical conduct, insider trading, and false financial reporting, causing significant financial and reputational harm to Zynex.

50.    The Code mandates that all employees, directors, and officers, including the

Individual Defendants, "conduct themselves accordingly and seek to avoid even the appearance of improper behavior." It emphasizes: "Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built." Defendants' orchestration of an oversupplying scheme, shipping excessive electrode pads and batteries to patients and billing insurers like Tricare for unwarranted amounts, violated this fundamental obligation by engaging in practices that drew regulatory scrutiny and potential penalties.

51.     The Code specifically addresses compliance with healthcare laws, stating:

> In particular, the Company's delivery of health care products is highly regulated by federal and state law with respect to fraud and abuse. These include laws and regulations, among others, (i) requiring strict privacy of patient information; (ii) regulating insurance billing, including Medicare and Medicaid; (iii) requiring state licenses for the sale of the Company's products; and (iii) (sic) prohibiting the offer of any payment by the Company or its representatives in return for the purchase or use of the Company's products.

52.     Defendants violated this provision by permitting Zynex to submit fraudulent claims to insurers, inflating revenue through excessive supply shipments. Defendants failed to disclose to investors, among other things: (1) that Zynex shipped products, including electrodes, in excess of need; (2) that, as a result of this practice, the Company inflated its revenue. This misconduct contravened federal and state regulations governing insurance billing, exposing Zynex to insurer network terminations and potential fines.

53.     Sandgaard and Moorhead, as CEO and CFO, directly oversaw false statements that concealed this scheme, such as the April 27, 2023, press release claiming a 36% revenue increase to $42.2 million due to "highest number of orders in Company history." These statements violated the Code's requirement for honest financial reporting, as they misrepresented the true driver of revenue—fraudulent billing practices.

54.     The Code mandates accurate record-keeping, stating under the subheading "Protect Privacy, Ensure Security," in relevant part:

-15-

All of the Company's books, records, accounts, billings and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained.

55.    The Defendants breached this duty by allowing Zynex's financial statements, such as the 2023 Form 10-K, to report inflated revenue without disclosing the oversupplying scheme. The 10-K's claim, "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment[,]" was misleading, as it implied robust controls while concealing invalid claims under insurer scrutiny. This violation led to a $6.2 million write-off of slow-collecting receivables, harming Zynex's financial integrity.

56.    Disbrow, Cress, and Michaels, as Audit Committee members, failed to ensure compliance with the Code's record-keeping standards. Their negligence allowed false financial reports to be disseminated, breaching their fiduciary duty to oversee accurate disclosures.

57.    The Code prohibits insider trading, stating: "Covered Persons who have access to confidential or non-public information about the Company are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business." Sandgaard sold 624,000 shares for more than $5.67 million, and Moorhead sold 85,000 shares for $687,200 during the Securities Class Action class period, exploiting nonpublic knowledge of the oversupplying scheme, which risked insurer scrutiny and revenue losses. These sales violated the Code and harmed Zynex by, among other things, undermining investor trust.

58.    The insider trading by Sandgaard and Moorhead directly contravened the Code's conflict of interest policy, which defines a conflict as "when a person's private interest interferes in any way with the interests of the Company." By profiting from inflated stock prices before the June 4, 2024, *STAT* report and the March 11, 2025, Tricare disclosure, these defendants prioritized

personal gain over Zynex's interests, exacerbating the stock's 51.3% collapse on March 12, 2025.

59.    The Code requires ethical conduct, stating: "Those who violate the standards in this Code will be subject to disciplinary action, up to and including termination of employment." The Defendants' failure to address the oversupplying scheme, despite prior lawsuits (*e.g.*, a 2014 claim alleging fraudulent Medicare billing) and other red flags, demonstrated unethical behavior, violating this mandate and exposing Zynex to reputational damage from patient complaints reported by *STAT*.

60.    The *STAT* report on June 4, 2024, revealed patient exploitation, quoting Michelle Bean: "I just feel like the whole thing was a way to make money and prey on people." This public exposure violated the Code's commitment to fair dealing, which requires: "Each Covered Person should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, competitors and employees." Defendants' inaction harmed Zynex's reputation, leading to insurer network terminations.

61.    The Code imposes specific obligations on Senior Financial Management, including Sandgaard and Moorhead, stating:

> All members of the Senior Financial Management shall: . . . Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications by the Company. . . . Promptly bring to the attention of the [CEO], Chief Operating Officer or the [CFO] any information concerning (a) significant deficiencies in the design or operation of internal controls[.]

62.    Sandgaard and Moorhead violated this duty by failing to disclose the oversupplying scheme's impact on Zynex's revenue and internal controls. Their false and misleading statements, such as the October 26, 2023, claim of "increasing revenue and cash flow momentum," concealed insurer scrutiny, leading to a $0.50 stock price drop on June 4, 2024, and a $3.59 drop on March 12, 2025.

63.    Defendants' violations caused Zynex to incur substantial financial losses, including litigation costs from the Securities Class Action, potential repayments to insurers, and tens of millions of dollars in stock repurchases at inflated prices during 2023 and 2024. The March 11, 2025, disclosure of Tricare's payment suspension, affecting 20–25% of revenue, confirmed the scheme's devastating impact, triggering a 51.3% stock price collapse.

64.    The reputational harm was equally severe, as the *STAT* report's exposure of patient exploitation and insurer terminations undermined Zynex's credibility. The Code's commitment to ethical conduct was breached, as the Individual Defendants' actions led to a "liar's discount" that will depress Zynex's stock price, increase its cost of capital, and hinder its ability to attract investors and maintain business relationships.

65.    Defendants' failure to report unethical practices violated the Code's complaint procedures, which encourage: "Any person who has complaints or concerns about the Company's accounting, internal accounting controls or auditing matters . . . is strongly encouraged to report such matters to the Audit Committee." By concealing the scheme, the Individual Defendants prevented timely corrective action, prolonging Zynex's exposure to harm.

66.    These Code violations breached the Individual Defendants' fiduciary duties of loyalty, good faith, and due care, as they prioritized personal gain and concealed misconduct that harmed Zynex. Defendants' actions directly caused the financial and reputational damages alleged, necessitating this derivative action to hold them accountable.

***Audit Committee Charter***

67.    Defendants Michaels, Disbrow, and Cress, as members of Zynex's Audit Committee, breached their fiduciary duties by failing to fulfill the responsibilities outlined in the Company's Audit Committee Charter. These breaches, tied to the fraudulent oversupplying

scheme and false financial statements alleged in the Securities Class Action, allowed Zynex to misrepresent its financial performance and compliance, causing significant harm, including a 51.3% stock price collapse on March 12, 2025.

68.    Zynex's Audit Committee Charter mandates that members "oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements." It specifies that members must be independent, financially literate, and include at least one "audit committee financial expert" per SEC regulations. Michaels, as Chair, and Disbrow and Cress, as members, were responsible for ensuring accurate financial disclosures and robust internal controls.

69.    The Audit Committee Charter requires the Audit Committee to:

[R]eview with management, and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

70.    Michaels, Disbrow, and Cress breached this duty by failing to detect or address the oversupplying scheme, whereby Zynex shipped excessive electrode pads and batteries to patients, inflating claims to insurers like Tricare. Moreover, they failed to disclose to investors that Zynex shipped products, including electrodes, in excess of need and that, as a result of this practice, the Company inflated its revenue. This scheme constituted fraud by management, which the Audit Committee consciously failed to investigate or address. The Audit Committee's negligence allowed false statements, such as the April 27, 2023, press release claiming a 36% revenue increase to $42.2 million, to be disseminated without scrutiny.

71.    The Audit Committee Charter mandates the Audit Committee to "review and discuss with the Company's independent auditors and management the Company's annual audited

financial statements . . . and the disclosure under 'Management's Discussion and Analysis of Financial Condition and Results of Operations'" before filing the Form 10-K. The 2023 Form 10-K, falsely claimed, "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment[,]" implying effective controls while concealing invalid claims under scrutiny. The Audit Committee's failure to challenge this misleading disclosure breached their duty to ensure accurate financial reporting.

72.     The charter requires the Audit Committee to:

> [R]eview with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements[.]

73.     The Audit Committee breached this duty by failing to timely take all or a portion of the Company's $6.2 million write-off of slow-collecting receivables. This omission misled investors about Zynex's financial health, contributing to the stock's artificial inflation until the March 11, 2025 disclosures.

74.     The Audit Committee Charter also mandates oversight of "the Company's relationships and transactions with related parties that are significant to the company." The Audit Committee failed to scrutinize insider trading by Sandgaard and Moorhead, which exploited material nonpublic information.  In fact, the Audit Committee approved Zynex's May and June 2023 repurchases of 600,000 common shares directly from Sandgaard at prices that were artificially inflated by the Individual Defendants' misconduct.

75.     The Charter requires the Audit Committee to "establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters[.]" Despite prior lawsuits, such as a 2014 claim

alleging fraudulent Medicare billing, and other red flags, the Audit Committee failed to implement effective complaint procedures, allowing the oversupplying scheme to persist undetected.

76.    The Audit Committee's breaches caused Zynex to suffer a 5% stock price drop on June 4, 2024, after the *STAT* report, and a 51.3% collapse on March 12, 2025, following the Tricare disclosure. These declines obliterated shareholder value and imposed a "liar's discount," depressing Zynex's future stock price and cost of capital, due to eroded market credibility.

77.    The financial harm includes litigation costs from the Securities Class Action, potential repayments to insurers, and tens of millions of dollars in stock repurchases at inflated prices.

78.    The reputational damage to Zynex was severe, as the *STAT* report's exposure of patient exploitation (*e.g.*, Michelle Bean's claim that Zynex "prey[ed] on people") and insurer terminations tarnished Zynex's image. The Audit Committee's negligence in addressing these risks violated its duty to protect Zynex's business integrity.

79.    By participating in and allowing the publication of materially false and misleading statements, Michaels, Disbrow, and Cress harmed Zynex, exposing it to regulatory scrutiny, financial losses, and reputational ruin. Their breaches of the Audit Committee Charter's duties necessitate this derivative action to hold them accountable for the resulting damages.

80.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making improper statements detailed herein, and failing to properly oversee Zynex's public statements and internal control functions.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background of Zynex*

81.    Zynex started in 1996 as a medical device company, touting consistent revenue growth and operational success in the United States.

82.    Prior to the Relevant Period, Zynex's activities included strategic initiatives to expand its pain management product line and enhance its sales force. The Company secured FDA clearance for new devices and introduced therapy products like the Zynex Pro Thoracic Lumbar Sacral Orthosis. These efforts were framed as evidence of Zynex's innovation and market strength, reinforcing investor confidence in its ability to sustain growth.

83.    In 2022, the Company reported a 21% year-over-year revenue increase to $158.2 million, a 48% increase in orders, and seven consecutive years of profitability. These results, announced in a March 13, 2023 press release, set the stage for optimistic projections about Zynex's growth trajectory.

### *The Individual Defendants' Misconduct Allowed the Company to Inflate its Revenue and Mislead Investors*

84.    During the Relevant Period, the Individual Defendants orchestrated and allowed a scheme to inflate Zynex's stock price by issuing false and misleading statements about the Company's financial performance, operational practices, and compliance with insurance reimbursement policies. These statements concealed, among other things, a systemic "oversupplying scheme" whereby Zynex shipped excessive quantities of supplies, such as electrode pads and batteries, to patients, billing insurers for thousands of dollars more than necessary.

85.    On April 27, 2023, Zynex issued a press release announcing first-quarter 2023 results, claiming a 36% revenue increase to $42.2 million and a 61% increase in orders, marking

the "highest number of orders in Company history for the 4th consecutive quarter." The Company stated, "For the first quarter, the Company reported net revenue of $42.2 million, a 36% increase over [the] first quarter of 2022." These statements omitted that revenue growth was driven by improper conduct, including fraudulent billing practices.

86.    On July 27, 2023, Zynex reported second-quarter 2023 results, touting a 22% revenue increase to $45.0 million and a 51% order increase. Sandgaard declared, "The growth in net revenue is primarily related to a 51% growth in device orders, which resulted from an increased customer base." This misrepresented the true driver of revenue: improper conduct, including excessive supply shipments that inflated claims to insurers.

87.    The Company's third-quarter 2023 press release on October 26, 2023, continued the deception, announcing a 20% revenue increase to $49.9 million and a 39% order increase. Sandgaard boasted, "[t]he third quarter was highlighted by increasing revenue and cash flow momentum driven by our sixth straight quarter of record-high order numbers." These claims concealed Zynex's reliance on improper conduct, including unethical billing practices, which were drawing scrutiny from insurers.

88.    On February 29, 2024, Zynex's full-year 2023 press release reported a 17% revenue increase to $184.3 million and a 43% order increase, with Sandgaard asserting, "2023 was a year of continued execution for Zynex, underscored by record revenues and order numbers, and exciting new products and technological innovation."

89.    Throughout the Relevant Period, the Individual Defendants misrepresented Zynex's compliance with third-party payer reimbursement policies. The 2023 Form 10-K stated: "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment." This suggested robust controls, while concealing that Zynex's

oversupplying scheme led to invalid claims and insurer denials. The Individual Defendants also failed to disclose that Zynex's practices drew scrutiny from insurers, including Tricare, which represented 20–25% of annual revenue.

90.    The truth began to emerge on June 4, 2024, when *STAT* published an investigative report titled "How a device maker inundated pain patients with unwanted batteries and surprise bills." The report revealed Zynex's oversupplying scheme, stating:

> Zynex Medical, with headquarters in Englewood, Colo., has manufactured small machines that deliver different series of electrical pulses to the injured areas via wires and electrode pads.

> \*       \*       \*

> . . . he regular shipments also allow Zynex to bill insurers for thousands of dollars more than it otherwise could.

> \*       \*       \*

> The problem is that insurers are growing wise to the program and kicking the company out of network.

91.    The *STAT* report detailed patient complaints, such as Michelle Bean, who received unneeded supplies and faced $1,000 in bills after Zynex falsely assured coverage by Tufts Health Plan. Former employees confirmed the scheme's systemic nature, costing Zynex business as insurers terminated network agreements.

92.    On June 4, 2024, Zynex's stock price fell $0.50 per share, or 5%, closing at $9.35 on unusually heavy trading volume, reflecting investor alarm over the exposed misconduct. This decline eroded shareholder value and signaled market distrust in Zynex's reported financials.

93.    Despite this disclosure, the Individual Defendants continued to make misleading statements. On July 25, 2024, Zynex's second-quarter 2024 press release claimed an 11% revenue increase to $49.9 million and a 20% order increase, with Sandgaard asserting, "[t]he second quarter

of 2024 was highlighted by a strong cadence of order growth and revenue[.]" The release attributed lower-than-expected revenue to sales force reductions, omitting insurer scrutiny as a factor.

94.    On October 24, 2024, Zynex reported third-quarter 2024 results, stating revenue was "$50.0 million" with a 13% order increase. Sandgaard claimed, "[i]n the third quarter of 2024 we continued our steady growth in orders as we positioned the company for long-term profitable growth[.]" These statements concealed ongoing insurer investigations, including Tricare's review of Zynex's claims.

95.    The full extent of Zynex's misconduct was revealed on March 11, 2025, when the Company issued a press release after market close, announcing fourth-quarter and full-year 2024 results. The release disclosed a significant revenue "shortfall" due to "slower than normal payments from certain payers" and revealed, "Tricare has temporarily suspended payments as they review prior claims."

96.    The March 11, 2025, press release admitted Tricare, representing 20–25% of Zynex's annual revenue, was scrutinizing prior claims, threatening the Company's financial stability. Sandgaard stated, "[o]ur fourth quarter revenue was less than expected. . . . We were recently notified that Tricare has temporarily suspended payments as they review prior claims." This disclosure confirmed the falsity of prior claims about revenue sustainability.

97.    On March 12, 2025, Zynex's stock price plummeted $3.59 per share, or 51.3%, closing at $3.41 on heavy trading volume. This catastrophic decline wiped out significant shareholder value, reflecting the market's reaction to Zynex's exposure to regulatory and financial risks concealed by the Individual Defendants.

### *False and Misleading Statements*

98.    Between at least March 13, 2023 and March 11, 2025, the Individual Defendants

engaged in and allowed a concerted scheme to mislead investors about Zynex's financial performance, operational practices, and regulatory compliance. By issuing false and misleading statements, the Individual Defendants artificially inflated Zynex's stock price, concealing a systemic "oversupplying scheme" that involved shipping excessive medical supplies to patients and billing insurers for unwarranted amounts.

99.    The Individual Defendants' false statements began on March 13, 2023, when Zynex issued a press release announcing its fourth-quarter and full-year 2022 financial results. The release touted robust growth, stating: "Revenue increased 21% year over year to $48.8 million" for the fourth quarter and "Revenue increased 21% year over year to $158.2 million" for the full year, with "Orders increased 48%" and "7th straight year of profitability."

100.    This press release misrepresented the sustainability of Zynex's revenue growth. The Individual Defendants failed to disclose that a material portion of the reported revenue stemmed from an unethical practice of oversupplying patients with electrode pads and batteries, inflating claims to insurers like Tricare, which represented 20–25% of Zynex's annual revenue. By omitting this material fact, the Defendants created a false impression of organic growth driven by legitimate demand.

101.    On March 14, 2023, Zynex filed its annual report for the fiscal year ended December 31, 2022 on Form 10-K with the SEC ("2022 Form 10-K"), reaffirming the financial results announced the previous day. The 10-K was signed by each of the Individual Defendants and included purported warnings about reimbursement risks, stating:

> We are dependent on reimbursement from third-party payers. . . . If the third-party payers do not remit payment on a timely basis or if they change their policies to exclude or reduce coverage for our products, we would experience a decline in our revenue as well as cash flow. . . . Failure to adequately identify and provide for amounts for resolution of repayment demands in our allowance for provider discounts could have a material adverse effect on our results of operations and cash

flows.

102.    This statement was misleading because it suggested Zynex maintained adequate controls to address reimbursement disputes, while concealing that the Company's revenue was inflated by fraudulent billing practices. The Individual Defendants knew or recklessly disregarded that Zynex's oversupplying scheme was generating invalid claims, drawing scrutiny from insurers, and increasing the risk of network terminations and penalties.

103.    The 2022 10-K also included a purported warning about governmental audits, stating:

> We face periodic reviews and billing audits from governmental and private payers . . . If billing errors are identified in the sample of reviewed claims, the billing error can be extrapolated to all claims filed which could result in a larger overpayment than originally identified . . . [A]n adverse review or audit could result in: required refunding or retroactive adjustment of amounts we have been paid . . . state or Federal agencies imposing fines, penalties and other sanctions on us; loss of our right to participate in . . . one or more private payer networks.

104.    This disclosure was materially misleading because it framed audits as hypothetical risks, while the Individual Defendants were aware or should have been aware that Zynex's billing practices were already under scrutiny. By downplaying the likelihood of adverse consequences, the Individual Defendants misled investors about the Company's exposure to regulatory and financial risks.

105.    On April 27, 2023, Zynex issued a press release announcing first-quarter 2023 financial results, claiming a 36% revenue increase to $42.2 million and a 61% increase in orders year-over-year. The press release also indicated that Zynex had received the highest number of orders in Company history for the 4th consecutive quarter.

106.    These statements were false and misleading because the reported revenue and order growth were driven in material part by the oversupplying scheme, not legitimate customer demand.

The Individual Defendants omitted that Zynex was shipping excessive supplies to patients, inflating claims to insurers, and risking reimbursement denials. This misrepresentation painted a deceptively positive picture of Zynex's financial health, misleading investors about the Company's operational integrity.

107.    On July 27, 2023, Zynex released its second-quarter 2023 financial results, announcing a 22% revenue increase to $45.0 million and a 51% increase in orders. The press release stated:

> Net revenue was $45.0 million for the three months ended June 30, 2023, an increase of 22% from $36.8 million in the prior year quarter. The growth in net revenue is primarily related to a 51% growth in device orders, which resulted from an increased customer base.

108.    The press release further commented, "[o]rders increased 51% year-over-year; highest number of orders in Company history for the 5th consecutive quarter." These claims were misleading because the revenue and order increases were artificially inflated by Zynex's practice of sending unneeded supplies, which generated fraudulent claims. The Individual Defendants concealed that insurers were beginning to scrutinize these practices, increasing the likelihood of network terminations.

109.    The July 27, 2023, press release also highlighted strategic achievements, such as FDA clearance for the CM-1600 blood and fluid volume monitoring device and a $10 million share repurchase program. These statements implied operational strength and financial stability, further obscuring the risks posed by the oversupplying scheme. By failing to disclose this driver of revenue, the Individual Defendants misled investors about Zynex's long-term prospects.

110.    On October 26, 2023, Zynex issued a press release for third-quarter 2023 results, reporting a 20% revenue increase to $49.9 million and a 39% increase in orders. Sandgaard stated:

> The third quarter was highlighted by increasing revenue and cash flow momentum

driven by our sixth straight quarter of record-high order numbers . . . Our continued profitability and record positive cash flow allowed us to announce an additional $10 million share repurchase plan.

111.    This statement was false because the revenue growth was not driven by sustainable demand but by the fraudulent oversupplying scheme. The Individual Defendants' claim of "increasing revenue and cash flow momentum" omitted the material fact that Zynex's billing practices were under insurer scrutiny, risking significant revenue disruptions. The reference to a share repurchase plan further misled investors by suggesting financial confidence, despite looming regulatory risks.

112.    The October 26, 2023, press release also announced new therapy products, including the Zynex Pro Thoracic Lumbar Sacral Orthosis, claiming, "we continue to develop the next generation of patient monitoring equipment." This statement implied innovation-driven growth, while concealing that Zynex's core revenue stream relied in material part on unethical billing practices, exposing the Company to insurer backlash and potential penalties.

113.    On February 29, 2024, Zynex issued a press release announcing fourth-quarter and full-year 2023 financial results, reporting a 17% full-year revenue increase to $184.3 million and a 43% order increase. Sandgaard stated:

> 2023 was a year of continued execution for Zynex, underscored by record revenues and order numbers, and exciting new products and technological innovation . . . A strong cadence of increasing sales and profitable growth for our pain management division delivered a 43% improvement in orders year-over-year.

114.    This press release was misleading because it attributed revenue growth to "increasing sales and profitable growth," while omitting that the oversupplying scheme materially inflated revenue by billing insurers for unneeded supplies.

115.    The February 29, 2024, press release projected 2024 net revenue growth of approximately 22%, Sandgaard stated, "[w]e expect 2024 net revenue to increase approximately

22% compared to 2023. Part of our revenue growth will come from more aggressively promoting our bracing line of products[.]" This was misleading because it failed to account for the risks posed by insurer scrutiny and potential network terminations, which threatened Zynex's revenue stream.

116.    On March 12, 2024, Zynex filed its 2023 Form 10-K (which was signed by each of the Individual Defendants), reaffirming the 2023 financial results and repeating the misleading reimbursement risk disclosure from the 2022 Form 10-K:

> We are dependent on reimbursement from third-party payers. . . . Failure to adequately identify and provide for amounts for resolution of repayment demands in our allowance for provider discounts could have a material adverse effect on our results of operations and cash flows.

117.    This statement was false because it implied Zynex had adequate controls, while the Individual Defendants knew or recklessly disregarded that the Company's billing practices were generating invalid claims, drawing scrutiny from insurers like Tricare. The omission of this material fact misled investors about Zynex's financial stability and compliance.

118.    The 2023 Form 10-K also repeated the audit risk disclosure, stating:

> We face periodic reviews and billing audits from governmental and private payers . . . [a]n adverse review or audit could result in: required refunding or retroactive adjustment of amounts we have been paid . . . loss of our right to participate in . . . one or more private payer networks.

119.    This disclosure was misleading because it presented audits as routine risks, while concealing that Zynex's oversupplying scheme had already attracted insurer attention, increasing the likelihood of adverse outcomes. The Individual Defendants' failure to disclose this scrutiny misrepresented Zynex's regulatory compliance.

120.    On April 30, 2024, Zynex issued a press release for first-quarter 2024 results, reporting a 10% revenue increase to $46.5 million and a 23% order increase. Sandgaard stated:

> During the first quarter of 2024, we continued our focus on order growth, FDA approvals of next-generation devices, and new therapy products . . . We expect to

recognize that revenue over the remainder of the year and reaffirm 2024 guidance of at least $227 million.

121.    This reaffirmation of 2024 guidance misled investors by suggesting revenue stability, despite growing risks from insurer investigations.

122.    The truth about the Individual Defendants' improper practices began to emerge on June 4, 2024, when the medical journal *STAT* published an investigative report titled "How a device maker inundated pain patients with unwanted batteries and surprise bills." This report detailed Zynex's unethical billing practices, stating:

> Zynex Medical, with headquarters in Englewood, Colo., has manufactured small machines that deliver different series of electrical pulses to the injured areas via wires and electrode pads.

> *        *        *

> . . . the regular shipments also allow Zynex to bill insurers for thousands of dollars more than it otherwise could.

> *        *        *

> The problem is that insurers are growing wise to the program and kicking the company out of network.

123.    The *STAT* report revealed that Zynex's oversupplying scheme involved sending unneeded electrode pads and batteries to patients, generating fraudulent claims that cost insurers thousands. It cited patient Michelle Bean, who received monthly shipments despite minimal device use and faced $1,000 in bills after Zynex falsely assured coverage by Tufts Health Plan. Bean remarked, "I just feel like the whole thing was a way to make money and prey on people."

124.    The report further disclosed that insurers were terminating Zynex from their networks due to these practices, leaving patients liable for unsolicited supplies. It noted, "STAT interviewed five other patients in the same predicament as Bean, and reviewed dozens of similar complaints in online forums." Former employees confirmed the scheme's systemic nature, stating

it "frequently cost the company business" as insurers rejected claims.

125.    Despite these disclosures, the Individual Defendants continued to mislead investors. On July 25, 2024, Zynex issued a press release for second-quarter 2024 results, reporting an 11% revenue increase to $49.9 million and a 20% order increase. Sandgaard stated:

> The second quarter of 2024 was highlighted by a strong cadence of order growth and revenue as we work toward FDA approvals of next-generation devices and launch of new pain management products . . . Revenue during the quarter was impacted by a continued change in product mix . . . and a reduction in sales representatives.

126.    This statement was misleading because it attributed revenue shortfalls to product mix and sales force reductions, omitting that insurer scrutiny, including from Tricare, was delaying payments due to the oversupplying scheme. The Individual Defendants' failure to disclose this scrutiny perpetuated the false narrative of operational strength, delaying the full revelation of Zynex's risks.

127.    The July 25, 2024, press release also claimed, "In the second quarter, increasing sales and profitable growth for our pain management division delivered a 20% improvement in orders year-over-year." This misrepresented the sustainability of order growth, as the oversupplying scheme artificially inflated orders, exposing Zynex to insurer backlash and potential revenue losses.

128.    On October 24, 2024, Zynex issued a press release for third-quarter 2024 results, reporting revenue of $50.0 million and a 13% order increase. Sandgaard stated:

> In the third quarter of 2024 we continued our steady growth in orders as we positioned the company for long-term profitable growth . . . Our Pain Management division delivered a 13% improvement in orders year-over-year . . . Revenue per sales rep increased 25% year-over-year to approximately $530,000 in the third quarter of 2024.

129.    This statement was misleading because it concealed ongoing insurer investigations,

including Tricare's review of Zynex's claims, which threatened 20–25% of the Company's revenue. The claim of "steady growth" misled investors by omitting the material risk of payment suspensions, perpetuating the artificial inflation of Zynex's stock price.

130.    The October 24, 2024, press release also highlighted FDA clearance for the TensWave device, suggesting innovation-driven growth. This misrepresented Zynex's prospects, as the Company's core revenue relied on improper billing practices, undermining its financial stability. The Individual Defendants' failure to disclose these risks further delayed investor awareness of Zynex's true condition.

131.    The Individual Defendants' misconduct was more fully revealed on March 11, 2025, after market close, when the Company issued a press release announcing fourth-quarter and full-year 2024 financial results. The release disclosed a significant revenue "shortfall" due to "slower than normal payments from certain payers" and revealed:

> Our fourth quarter revenue was less than expected. The shortfall was due to slower than normal payments from certain payers and we were recently notified that Tricare has temporarily suspended payments as they review prior claims. . . . TriCare currently represents approximately 20-25% of our annual revenue.

132.    This disclosure confirmed the misleading nature of Defendants' prior statements, such as Sandgaard's October 26, 2023, claim of "increasing revenue and cash flow momentum" and the February 29, 2024, projection of 22% revenue growth for 2024. The Tricare payment suspension exposed Zynex's reliance on fraudulent claims, threatening a significant portion of its revenue stream.

133.    The March 11, 2025, press release also announced a 15% staff reduction, primarily in corporate departments, to align with reduced revenue, stating, "[t]his staff reduction along with other expense reductions . . . will result in savings of approximately $35 million annually." This restructuring underscored the severity of Zynex's financial distress, contradicting prior claims of

"long-term profitable growth."

134.    On March 12, 2025, Zynex's stock price plummeted $3.59 per share, or 51.3%, closing at $3.41 on unusually heavy trading volume. This catastrophic decline obliterated shareholder value, reducing Zynex's market capitalization by over half in a single day. The drop reflected the market's realization that Zynex's revenue was unsustainable due to its fraudulent practices and regulatory scrutiny.

135.    The March 12, 2025, stock price collapse caused immediate financial harm to Zynex, as shareholders who relied on the Defendants' false statements suffered massive losses. The Company's market credibility was shattered, imposing a "liar's discount" that will depress its stock price for years, as investors distrust future financial reports.

### *Additional False and Misleading Statements in Proxy Statements*

136.    Defendants Sandgaard, Disbrow, Cress, and Michaels (the "Director Defendants") negligently misrepresented and failed to disclose material information in Zynex's proxy statements filed on March 30, 2023 ("2023 Proxy") and April 1, 2024 ("2024 Proxy"), thereby misleading shareholders about the effectiveness of the Board's oversight as well as Zynex's financial performance, governance, compliance, and strategic priorities.

137.    The Director Defendants filed the Company's 2023 Proxy on March 30, 2023, disclosing information in connection with Zynex's Annual Meeting on May 17, 2023.  The 2023 Proxy outlined the Board's responsibility for:

> oversee[ing] management of the Company's risks and looks to its audit committee, as well as senior management, to support the Board's oversight role. The Company's Audit Committee assists with oversight of financial risks. The full Board regularly receives information through committee reports and from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, technical and strategic risks.

138.    The Director Defendants negligently omitted the material risks related to their

failures of oversight regarding the oversupplying scheme and related misconduct, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

139. The 2023 Proxy detailed the Compensation Committee's duty to "to review and approve all corporate goals and objectives applicable to the compensation of the CEO, evaluate annually the CEO's performance in light of those goals and determine and approve the CEO's compensation level based on its evaluation."

140. The Director Defendants negligently omitted the material risks related to their failures of oversight regarding Sandgaard's participation in the oversupplying scheme and related misconduct, and the committee's failure to align CEO compensation with legitimate performance, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

141. The 2023 Proxy detailed the Nominating and Corporate Governance Committee's responsibilities, including "to oversee the Company's corporate governance practices and procedures."

142. The Director Defendants negligently omitted the material risks related to their failures of oversight regarding the oversupplying scheme and related misconduct, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

143. The 2023 Proxy described the Audit Committee's role in "oversight of the integrity of the Company's accounting, auditing, and reporting practices," including:

- Overseeing the integrity of Zynex's financial reporting

- Overseeing the independence, qualifications and performance of Zynex's external independent registered public accounting firm and the performance of Zynex's internal auditors

- Reviewing with independent registered public accounting firm and outside legal counsel: legal matters that may have a material impact on the financial statements; any fraud involving management or other employees who have a significant role in Zynex's internal controls; compliance policies; and any material reports or inquiries received that raise material issues regarding Zynex's financial statements and accounting or compliance policies. The Committee oversees the Company's anonymous complaint policy contained within the Company's [Code] regarding the confidential, anonymous submission by employees of reports regarding questionable accounting practices, internal accounting controls or auditing matters and the investigation, disposition and retention of such reports

- Reviewing annual audited financial statements with management and the Zynex's independent registered public accounting firm and recommending to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K.

- Reviewing and discussing with management and Zynex's independent registered public accounting firm quarterly financial statements and earnings releases

                    *        *        *

- Discussing policies with respect to risk assessment and risk management, including risks affecting Zynex's financial statements, operations, business continuity, and reputation and the reliability and security of the Company's information technology and security systems, and the steps management has undertaken to monitor and control such exposures

                    *        *        *

- Advising the Board with regard to Zynex's policies and procedures regarding compliance with laws and regulations

                    *        *        *

- Reviewing the adequacy and effectiveness of Zynex's internal control over financial reporting, including information technology and security systems related to internal controls, and disclosure controls and procedures

144.    The Director Defendants negligently omitted the material risks related to the Audit Committee's failures of oversight regarding the oversupplying scheme and related misconduct

(including the misleading financials, disclosures, and compliance failures), leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

145.    Zynex's 2024 Proxy was similarly misleading. The Director Defendants filed the Company's 2024 Proxy on April 1, 2024, disclosing information in connection with Zynex's Annual Meeting on May 16, 2024. The 2024 Proxy outlined the Board's responsibility for:

> oversee[ing] management of the Company's risks and looks to its audit committee, as well as senior management, to support the Board's oversight role. The Company's Audit Committee assists with oversight of financial risks. The full Board regularly receives information through committee reports and from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, technical and strategic risks.

146.    The Director Defendants negligently omitted the material risks related to their failures of oversight regarding the oversupplying scheme and related misconduct, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

147.    The 2024 Proxy detailed the Compensation Committee's duty to "to review and approve all corporate goals and objectives applicable to the compensation of the CEO, evaluate annually the CEO's performance in light of those goals and determine and approve the CEO's compensation level based on its evaluation."

148.    The Director Defendants negligently omitted the material risks related to their failures of oversight regarding Sandgaard's participation in the oversupplying scheme and related misconduct, and the committee's failure to align CEO compensation with legitimate performance, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

149.    The 2024 Proxy detailed the Nominating and Corporate Governance Committee's

responsibilities, including "to oversee the Company's corporate governance practices and procedures."

150.    The Director Defendants negligently omitted the material risks related to their failures of oversight regarding the oversupplying scheme and related misconduct (including the insider selling), leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

151.    The 2024 Proxy described the Audit Committee's role in "oversight of the integrity of the Company's accounting, auditing, and reporting practices," including:

- Overseeing the integrity of Zynex's financial reporting

- Overseeing the independence, qualifications and performance of Zynex's external independent registered public accounting firm and the performance of Zynex's internal auditors

- Reviewing with independent registered public accounting firm and outside legal counsel: legal matters that may have a material impact on the financial statements; any fraud involving management or other employees who have a significant role in Zynex's internal controls; compliance policies; and any material reports or inquiries received that raise material issues regarding Zynex's financial statements and accounting or compliance policies. The Committee oversees the Company's anonymous complaint policy contained within the Company's [Code] regarding the confidential, anonymous submission by employees of reports regarding questionable accounting practices, internal accounting controls or auditing matters and the investigation, disposition and retention of such reports

- Reviewing annual audited financial statements with management and the Zynex's independent registered public accounting firm and recommending to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K

- Reviewing and discussing with management and Zynex's independent registered public accounting firm quarterly financial statements and earnings releases

*        *        *

- Discussing policies with respect to risk assessment and risk management, including risks affecting Zynex's financial statements, operations, business continuity, and reputation and the reliability and security of the Company's information technology

-38-

and security systems, and the steps management has undertaken to monitor and control such exposures

\*     \*     \*

- Advising the Board with regard to Zynex's policies and procedures regarding compliance with laws and regulations

\*     \*     \*

- Reviewing the adequacy and effectiveness of Zynex's internal control over financial reporting, including information technology and security systems related to internal controls, and disclosure controls and procedures

152.     The Director Defendants negligently omitted the material risks related to the Audit Committee's failures of oversight regarding the oversupplying scheme and related misconduct (including the misleading financials, disclosures, and compliance failures), leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board.  Absent such omissions, the Director Defendants would likely not have been reelected.

### *Insider Sales*

153.     Defendants Sandgaard and Moorhead breached their fiduciary duties to Zynex by engaging in insider trading, selling substantial quantities of Zynex common stock at artificially inflated prices, on the basis of material nonpublic information about Defendants' misconduct.

154.     On May 10, 2023, Sandgaard sold 300,000 shares of his own Zynex common stock back to the Company at the artificially inflated price of $9.61 per share, realizing proceeds of more than $2.88 million. On June 13, 2023, Sandgaard sold another 300,000 shares of his Zynex common stock back to the Company at the artificially inflated price of $8.62 per share, realizing proceeds of more than $2.58 million. In each instance, the transaction was approved by the Board's

Audit Committee and the purportedly disinterested members of the Board, in violation of each of the Individual Defendants' fiduciary duties.

155.    Additionally, during October and November 2024, Sandgaard sold 24,000 shares of Zynex common stock at artificially inflated prices, reaping more than $200,000 in proceeds.

156.    Between August 2023 and March 2025, Moorhead sold 85,000 shares of his own Zynex common stock at artificially inflated prices, generating more than $680,000 in proceeds.

157.    Defendants' insider trading exploited material nonpublic information, breaching their duties of loyalty and good faith, and unjustly enriching them at Zynex's expense. Disgorgement of their profits is necessary to remedy the harm inflicted on the Company and its shareholders.

**DAMAGES/HARM TO ZYNEX**

158.    As a direct and proximate result of the Individual Defendants' conduct, Zynex has suffered and will continue to suffer significant harm, including but not limited to: (i) expenditures associated with the Securities Class Action and any resolution thereof, including amounts paid to outside lawyers, accountants, and investigators; (ii) the loss of revenues due to the suspension of payments by Tricare and any other insurers affected by the misconduct; (iii) the overpayments in connection with the repurchase of more than $51.2 million (5,371,045 shares) of Zynex common stock at artificially inflated prices; and (iv) costs incurred from compensation and benefits paid to the Individual Defendants and other members of Zynex's management while they were engaged in the improper conduct alleged herein, which compensation was based in part on the Company's artificially inflated stock price.

159.    Additionally, as a result of the Individual Defendants' conduct, Zynex has suffered and will continue to suffer a loss of reputation and goodwill and will be subject to a "liar's

discount" that will plague the Company's stock price and its ability to raise capital on favorable terms.

## DERIVATIVE ALLEGATIONS

160.    Plaintiff brings this action derivatively and for the benefit of Zynex to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, and violations of the federal securities laws.

161.    Zynex is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

162.    Plaintiff is, and has been at all relevant times, a shareholder of Zynex. Plaintiff will adequately and fairly represent the interests of Zynex in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

163.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

164.    A pre-suit demand on the Board of Zynex is futile and, therefore, excused. At the time this action commenced, its four-member Board consisted of the Director Defendants (Sandgaard, Disbrow, Cress, and Michaels). As set forth below, all four Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

165.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants made, authorized and/or permitted the false and misleading statements to be disseminated directly to the public and made available and distributed to shareholders, made, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Indeed, each Director Defendant signed a false or materially misleading Form 10-K and issued the false and materially misleading proxy statements. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

166.    Defendants Disbrow, Cress, and Michaels, as members of the Audit Committee, were tasked with reviewing and approving the misleading statements and omissions, including those in SEC filings, press releases, and proxy statements. The Audit Committee's Charter provides that it is responsible for financial and other reporting and internal controls. Thus, these defendants were responsible for the improper statements. Despite their knowledge or reckless disregard, these members of the Audit Committee made and/or allowed each of the improper statements. These defendants breached their fiduciary duties and violated the federal securities laws by participating in the wrongdoing described herein. Thus, because these defendants face a substantial likelihood of liability, any demand upon them is futile.

167.    The Director Defendants, as members of the Board, were and are subject to the Company's Code goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Zynex's standards of business conduct. The Director Defendants violated the Code because they knowingly or recklessly engaged

in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code, they face a substantial likelihood of liability for breaching their fiduciary duties, and, therefore, demand upon them is futile.

168.    Any suit by the Director Defendants to remedy these wrongs would expose defendant Sandgaard and Zynex to liability for violations of the federal securities laws in the pending Securities Class Action. The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendant Sandgaard in this action, then Zynex's efforts would compromise its defense of the Securities Class Action.

169.    Additionally, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, such as the lack of functioning systems to prevent improper practices like the oversupply scheme, and failed to make a good faith effort to correct the problems or prevent their recurrence.

170.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Zynex, the Director Defendants knew, or should have known, the material facts surrounding the Company's ongoing oversupply scheme and the consequences thereof.

171.    Defendant Sandgaard, as President, CEO, and Chairman, is not disinterested or independent. Thus, the Company admits in its 2025 proxy statement that he is a non-independent

director. Further, Sandgaard is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein. He also faces significant personal liability for his insider trading, as described herein. Moreover, because Sandgaard controls the majority of Zynex's outstanding common stock and therefore controls the Board's membership, Disbrow, Cress, and Michaels are beholden to and controlled by him, and therefore they lack independence.

172.    Each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of their holdings.

173.    Accordingly, for all of the reasons set forth above, none of the Company's four current directors can consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

### FIRST CLAIM
**Against the Individual Defendants
for Breaches of Fiduciary Duties**

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Individual Defendant owed to the Company fiduciary obligations, including the duty to exercise candor, good faith, and loyalty in the management and administration of Zynex's business and affairs as directors and/or officers of the Company.

176.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith, by causing or allowing the Company to engage in the misconduct described herein.

177.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.    Additionally, Sandgaard's and Moorhead's insider sales of stock while in possession and control and on the basis of material, adverse, nonpublic information was a breach of their fiduciary duties of loyalty and good faith.

179.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

180.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zynex has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending the Securities Class Action, overpayment for stock repurchases, severe damage to the share price of the Company's

stock, and an increased cost of capital. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants
### for Unjust Enrichment

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made, caused, or allowed to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Zynex.

184.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Zynex tied to the performance or artificially inflated valuation of Zynex, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, and/or received proceeds of improper insider sales.

185.    Plaintiff, as a stockholder and a representative of Zynex, seeks restitution and an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, other compensation, and insider proceeds—obtained by the Individual Defendants due to their wrongful conduct and breach of fiduciary duties.

186.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants
### for Abuse of Control

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

188.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zynex, for which they are legally responsible.

189.    As a direct and proximate result of the Individual Defendants' abuse of control, Zynex has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants**
**for Gross Mismanagement**

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zynex in a manner consistent with the operations of a publicly-held corporation.

193.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zynex has sustained and will continue to sustain significant damages.

194.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants
### for Waste of Corporate Assets

196.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company. They further caused the Company to overpay for its share repurchases, which were undertaken at prices artificially inflated by the Individual Defendants' misconduct.

198.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Zynex to waste valuable corporate assets. The Individual Defendants' misconduct has also caused the Company to incur many millions of dollars of legal liability and/or costs to defend against actions and investigations, including the Securities Class Action.

199.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

200.     Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants
### for Violations of Section 14(a) of the Exchange Act

201.     Plaintiff incorporates by reference and realleges the allegations set forth above. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on allegations of reckless or knowing conduct by or on behalf of the Individual Defendants. Plaintiff disclaims any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

202.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

203.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

204.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy and 2024 Proxy were materially false and misleading. These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the proxy statements.

205.    The false and misleading elements of the 2023 Proxy and the 2024 Proxy led to the re-election of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to Zynex.

206.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

207.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants**
**for Violations of Section 20(a) of the Exchange Act**

208.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.     The Individual Defendants, by virtue of their positions with Zynex and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Zynex and the directors who made the false and misleading statements in the 2023 Proxy and the 2024 Proxy. The Individual Defendants had the power and influence, and exercised the same, to cause the issuance of the misleading statements in the proxies.

210.     Plaintiff, on behalf of Zynex, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Zynex, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zynex, have been unjustly enriched, abused their control, committed gross mismanagement, wasted corporate assets, and violated the Exchange Act;

(c)     Determining and awarding to Zynex the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Awarding to Zynex restitution from the Individual Defendants, and each of

them, and ordering disgorgement of all profits, benefits, other compensation, and insider trading proceeds obtained by the Individual Defendants;

(e)    Directing Zynex and the Individual Defendants to take all necessary actions to reform and improve Zynex's corporate governance and internal procedures to comply with applicable laws and to protect Zynex and its shareholders from a repeat of the damaging events described herein;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: July 9, 2025                **JOHNSON FISTEL, PLLP**

*s/ Jeffrey A. Berens*
Jeffrey A. Berens
Bryan I. Schild
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: 303.861.1764
jeffb@johnsonfistel.com
bryans@johnsonfistel.com

Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470.632.6000
michaelf@johnsonfistel.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Correy A. Suk
Daniel Tepper

33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: 212.363.7500
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Patrick Ayers, do hereby verify that I am a holder of common stock of Zynex, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint and Jury Demand (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  July __9__, 2025

*Patrick Ayers*
Patrick Ayers (Jul 9, 2025 10:09 EDT)

Patrick Ayers